UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
LILLIAN ROBERTS and MAF MISBAH UDDIN,    :     04 CIV. 7671 (DLC)
                                         :
                 Plaintiffs,             :     OPINION & ORDER
                                         :     ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
        -v-                              :
                                         :
RAYMOND MARKEY, LOUIS A. SBAR, GENE      :
DeMARTINO, ALEX PARKER, ROBERT           :
SCHIRMER, FAYE MOORE, VICTOR             :
EMANUELSON, EDNA M. WILLIAMS, MICKY      :
McFARLAND, LEONARD DAVIDMAN, JOHN        :
SOCHA, BARBARA HENDERSON, RALPH F.       :
CARBONE, PATRICK J. BAHNKEN, JUAN        :
FERNANDEZ, EDWARD W. HYSYK, MICHAEL      :
HOOD, and "JANE AND JOHN DOES" (said     :
names being false and fictitious as the  :
names of these other defendants are      :
unknown at this time),                   :
                                         :
                 Defendants.             :
                                         :
----------------------------------------X

Appearances

For Plaintiffs:
Ivan D. Smith
Vladeck, Waldman, Elias & Engelhard,
P.C.
1501 Broadway, Suite 800
New York, NY 10036

For Defendants:
Arthur Z. Schwartz
Schwartz, Lichten & Bright, P.C.
113 University Place
New York, NY 10003

DENISE COTE, District Judge:

     This action presents a small snapshot of a bitter,

protracted struggle for control of New York's largest municipal

union, a struggle that has brought several of the parties before

this Court in numerous actions.  Plaintiffs Lillian Roberts and

Maf Misbah Uddin are the Executive Director and Treasurer,

respectively, of District Council 37 ("DC 37"), American

Federation of State, County and Municipal Employees ("AFSCME"),

which represents over 115,000 workers.  The seventeen defendants

are vice presidents and members of the Executive Board (the

"Board") of DC 37.[1]  On February 11, 2004, at the first Board

meeting following a hotly contested election for control of the

union, the Board voted to cut significantly the salaries of both

plaintiffs.  The motion to reduce the salaries passed seventeen

to eight; all of the Board members who voted in its favor,

including several women and African-Americans, are named as

defendants in this action.

Relying almost exclusively on evidence of bias by one

defendant, plaintiffs claim the Board action represented

discrimination and filed this action under 42 U.S.C. § 1981, and

New York State and City antidiscrimination statutes.  Defendants

moved for summary judgment on all counts.  Because the plaintiffs

have not shown that the bias of one Board member caused the Board

to reduce the plaintiffs' salaries, that motion is granted.


BACKGROUND

The following facts are either undisputed or taken in the

light most reasonable to the plaintiffs, unless otherwise noted.[2]

---

[1] The Board comprises twenty vice presidents and five
executive officers.

[2] It is particularly noteworthy that Uddin did not submit
any evidence in the form of affidavit and that Roberts's brief
affidavit contains mostly background information not truly
relevant to her claims of discrimination.  Her only statement

Roberts was first elected Executive Director in February 2002 at age 74. She was DC 37's fourth Executive Director and the first woman to hold this position. The Board set her salary at $250,000 a year. This matched the salary of the previous Executive Director, a black male who resigned in 1998. (Between 1998 and 2002, the executive directorship was vacant and DC37 was run by an administrator appointed by its parent union.) The salary of the treasurer at that time, Mark Rosenthal, was $180,000.

In her first years in office, Roberts had a difficult relationship with some prominent members of the union, including Mr. Rosenthal, who Roberts believes attempted to undermine her authority. Some of the tension apparently dates back to December 2002, when the Ethical Practices Officer of DC37 found that Roberts had likely violated the Ethical Practices Code of DC37 by hiring her nephew's law firm to represent the union's Benefit Trust Fund, of which Roberts was a trustee. This finding was adopted by the Ethical Practices Committee of DC37, and on its recommendation, the Board voted to terminate the union's contract

---

that could function as evidence of discriminatory animus relates to the stray remark of a non-defendant who is not alleged to have participated in the decision to cut plaintiffs' salaries.

Other than the affidavit from Rabbi Birnahck, which is described below, the plaintiffs rely almost exclusively on deposition testimony to support their arguments. The result is a record that is woefully lacking not only specific details concerning key questions of fact, but also admissible evidence that a factfinder could rely on to support a verdict.

with the firm in April 2003.[3]

In July 2003, Charles Ensley, the President of one of DC37's larger locals, announced that he would be running against Roberts in the election scheduled for January 2004.  This was to be the first contested election in the union's history.

Roberts ran for reelection on the Members First Slate.  Co-plaintiff Uddin ran for Treasurer on this slate.  Ensley and then-treasurer Rosenthal ran on the Unity Slate.  Under the DC37 Constitution, the Executive Officers (which include the Executive Director and the Treasurer) and the Vice Presidents, who together make up the Board, are elected by delegates from the locals. Among the fliers sent out to the delegates to promote the candidates, one received special attention from members of the Unity slate.  This flyer, which Uddin denies sending himself but was sent to support his candidacy, makes a special issue of

---

[3] Roberts claims that the Ethical Practices Officer found that the Benefit Trust Fund, rather than Roberts herself, had violated the Ethical Practices Code.  The section of the Code of Ethical Practices under which the complaint was brought provides that "it shall not be permissible for any officer or managerial employee of the council to . . . make a decision, or cause a decision to be made, concerning a business relationship with a firm in which a [family member] . . . has a significant financial interest."  In light of the Ethical Practices Officer's conclusion that "Ms. Roberts -- an officer of the District Council -- made or caused to be made a decision regarding a business relationship with a firm . . . in which a close relative . . . has a significant interest," Roberts's interpretation of the report is untenable.  Roberts is correct, though, that she was cleared of the charges by the AFSCME Judicial Panel.  The Panel noted that "although a reasonable person could come to the conclusion in view of the universe of relationships that are covered . . . that a nephew would also be covered," nephews were not actually included in the Code and Roberts had not technically violated the provision.

Rosenthal's salary. Large type on the flyer reads "While Rosenthal Goes to the Bank . . . Poor Single Mothers Pay the Price," and smaller type states that Rosenthal "pulls in the big bucks: over $1/4 Million a year."

Roberts and Uddin won their races; both were elected to three-year terms. The Unity Slate proved more successful in the vice presidential races, winning a majority of seats on the Board.

In February 2004, the new Executive Board met for the first time. At that meeting, the Board passed a resolution to cut Roberts's salary by $75,000 (from $250,000 to $175,000) and Uddin's by $40,000 (from $180,000 to $140,000). The prefatory language of the resolution justified the measure as follows: "[T]he salaries of the Treasurer and the Executive Director are out of line with those paid to other major New York City labor leaders and do not reflect the general wage level of the DC 37 membership."

The resolution was subject to less discussion at the Board Meeting than might have been expected. As reflected in the minutes of the meeting, defendant Bahnken cited press accounts of labor salaries as he introduced the motion to cut the salaries. There were some objections that such a motion should be brought in a budget meeting and a comment that both salaries could have been cut some years before when Roberts first assumed the office. Defendant Bahnken replied that he wasn't at the meeting where the salary was first set and that he "came up with a number [he]

thought was fair and in line with what the earnings are of what our members make." Bahnken also conveyed his understanding that DC 37 was $1.6 million in debt.

Defendant Emanuelson, who was new to the Executive Board, pointed to the focus in the recent election on the previous treasurer's salary and that he had been accused of "laughing his way to the bank." Emanuelson further explained that the Executive Director's salary was "way out of line" when "we looked at what other Executive Directors make." Defendant Markey similarly referred to "a sack full of literature from the new Treasurer of District Council 37 [Uddin] making all sorts of comments over and over and over again about the previous Treasurer's salary." Markey further stated that he had expected Uddin to make the motion to reduce his salary himself after having campaigned on the issue, and implied that he had urged his fellow Board members to delay in bringing the motion in case Uddin did so. The motion passed seventeen to eight.

As Markey's last comment suggests (and as at least two of the dissenting Board members pointed out), defendants' decision to reduce plaintiffs' salaries appears to actually have been made before the Board meeting. Shortly after the election, but before the Board meeting, several of the defendants met with other members of the Unity slate to discuss various issues relating to the recent election. The evidence is unclear as to exactly when and where the meeting occurred, how many people were present, and even how many of those meetings took place. The only evidence

offered relating to these meetings derives from defendants'
depositions, offered by plaintiffs in opposition to this motion.
Sbar admitted to being at the meeting, but DeMartino stated in
his deposition that he didn't recall Sbar saying anything.  Moore
recalled that Markey brought up the subject and specifically
mentioned the participation of at least four others, including
two defendants (herself and Hysyk) in the conversation.
Plaintiffs have pointed to no evidence in their statement of
facts or brief that would impeach these assertions.

In their depositions, the defendants recalled various
reasons for the cuts that were discussed at the meeting, as well
as their own motivations for supporting the measure.  Two reasons
featured most prominently.  First, the defendants expressed a
shared view that the Executive Director's salary was excessive,
either in absolute terms or relative to that of other labor
leaders.  Second, the defendants drew a connection between the
campaign literature focusing on Rosenthal's salary and the cuts
they later proposed and approved.  Some explained the connection
in terms of fairness, explaining that plaintiffs had made an
issue of the previous salaries being too high and now should be
required to live by their words; others felt that the campaign
literature was anti-Semitic and that plaintiffs should be
punished for pandering to the prejudices of voters.  Other
justifications invoked for the cuts included a perception that
Roberts had not been doing a good job as Executive Director, a
desire for political retaliation, and in the case of the

Treasurer's salary, a need to keep the salaries proportionate. Some defendants, however, professed that Roberts's performance and political motives did not factor into their decisions at all. All appeared to agree that plaintiffs were qualified to hold their positions. Little evidence was offered to show exactly who was responsible for suggesting the cuts in the first place, but at least one recalled defendant Markey as the original proponent.

Rabbi Mayer Birnahck, a member of the local of which defendant Sbar is president, submitted an affidavit recounting numerous derogatory remarks he has heard Sbar make. Most relevant to the present action, Birnahck relates a conversation he had with Sbar shortly after the 2004 election. Sbar had called Birnahck from a DC 37 Board meeting and told him of the salary cuts. When Birnahck asked why they didn't cut Roberts's salary further, Sbar responded "We were too scared to go so far against that dame [sic] Nigger -- she deserves all she has coming to her." Birnahck also recounts four other occasions when he heard Sbar use the same derogatory term to refer to Roberts both before and after the 2004 election. Among the comments Sbar is reported to have made are that Roberts "is a damn f[uc]ken Nigger that has to go," and that "We have to get rid of that out of control Nigger ASAP." Finally, Birnahck has heard Sbar comment appreciatively on women's "sexy legs" and general physical appearance (as "hot chicks") in a way that Birnahck found offensive.

Plaintiffs submit the deposition testimony of two

defendants, Parker and Sbar himself, as further evidence of the latter's racial attitudes. Parker stated that he believes Sbar is a racist based on "a feeling that I get from him." Parker also recounted that juvenile detainees at the facility where both defendants work had complained that Sbar had called them "monkeys," and that he was inclined to believe them.

Sbar denied that he had ever used the word "nigger" to refer to Roberts or the word "monkey" to refer to children at his facility. But he did admit to making other derogatory comments. These comments, referenced repeatedly by plaintiffs, include his use as a child of a common rhyming game that contains the word "nigger" and various comments about Chinese people, specifically that Chinatown smells, that the smell has "something to do with the Chinese," that he wouldn't want to take public transportation with Chinese people, and that he "can't stand to hear them talk."

Roberts herself testified in deposition about the foundation for her belief that she was discriminated against on the bases of race, sex, and age. Most of her testimony in this regard referred to comments or events that others had described to her. Some involved Charles Ensley, who was her opponent in the 2004 election. Ensley is not a defendant in this case and is not alleged to have influenced or participated in the vote to cut plaintiffs' salaries. Still other testimony related to her "feelings" that certain of the defendants were racist or were not comfortable with women being in positions of power. Roberts recounted one specific event involving a defendant that she

experienced firsthand. She heard defendant Hysyk say that "he felt like he was castrated sitting at meetings" during DC 37's women's month where female speakers discuss women's issues.

Uddin also testified in deposition about comments he had heard others make. Uddin explained that, before he joined the Members First Slate, he had a series of discussions with Ensley, Rosenthal, and various other members of what would become the Unity Slate regarding which group of candidates he would run with. Uddin offered no specific details as to who said what, but did say that "the age issue was discussed among them a lot" as a reason not to support Roberts. Individuals in these conversations expressed their feelings that Roberts was "too old to handle such a complex job," that it was "so much responsibility . . . too much at this age."

## DISCUSSION

A. Summary Judgment Standard

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 465 (2d Cir. 2000). The standard is no different in employment discrimination cases. Id. (citing Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133 (2000)). Thus, even though the evidence must be viewed in the light most favorable to the non-moving party, with all reasonable inferences drawn in its favor, "the test for summary judgment" even in discrimination

cases, "is whether the evidence can reasonable support a verdict in the plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000); see also Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) ("A court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." (citation omitted)).

Rule 56(e), Fed. R. Civ. P., requires that affidavits submitted in support of or in opposition to the summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." This requirement means that hearsay assertions that would not be admissible at trial if testified to by the affiant are insufficient to create a genuine issue of fact. Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). "Nor is a genuine issue created merely by the presentation of assertions that are conclusory." Id.


B. Claims of Race Discrimination under 42 U.S.C. § 1981

Plaintiffs bring their claims for race discrimination under 42 U.S.C. § 1981. Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This

section outlaws "discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson, 375 F.3d at 224.

In claims of employment discrimination under Section 1981, courts apply the same standards as in Title VII cases. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000). Plaintiffs' Section 1981 claims are therefore analyzed under the burden-shifting framework laid out by the Supreme Court in a series of cases beginning with McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 838 (2d Cir. 1996) (analyzing Section 1981 employment discrimination claim under burden-shifting test).

First, the plaintiffs must establish a prima facie case of race discrimination. Reeves, 530 U.S. at 142. Once this is done, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action. The employer's is a burden of production, not persuasion; no credibility assessment is involved in determining whether it has been met. Id. If the employer meets its burden, "the McDonnell Douglas presumptions disappear from the case," James, 233 F.3d at 156, and "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against him because of his race." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

A plaintiff may try to do this by proving that the

12

employer's proffered reason is pretextual.  Establishing pretext
may be of great assistance to a plaintiff, for in many cases,
"once the employer's justification has been eliminated,
discrimination may well be the most likely alternative
explanation."  <u>Reeves</u>, 530 U.S. at 147-48.  But "it is not enough
. . . to <u>dis</u>believe the employer; the factfinder must believe the
plaintiff's explanation of intentional discrimination."  <u>St.
Mary's</u>, 509 U.S. at 519; <u>see also</u> <u>Renz v. Grey Advertising, Inc.</u>,
135 F.3d 217, 222 n.3 (2d Cir. 1997) (noting that "a
discrimination plaintiff may not succeed by proving only that a
proffered explanation is false but must prove that discrimination
motivated the adverse action").  Thus, even if the employer's
proffered rationale was pretextual, it would still be "entitled
to judgment as a matter of law if the record conclusively
revealed some other, nondiscriminatory reason for the employer's
decision."  <u>Reeves</u>, 530 U.S. at 148.

Finally, if a plaintiff succeeds in establishing a
discriminatory motive for the employment action, she must still
"demonstrate that the causal connection between the defendant's
action and the plaintiff's injury is sufficiently direct."  <u>Back
v. Hastings on Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 125
(2d Cir. 2004) (Section 1983 employment discrimination action).
"Ordinary principles of causation" govern this inquiry.  <u>Id.</u>
(citation omitted); <u>see also</u> <u>Coral Const. Co. v. King County</u>, 941
F.2d 910, 926 (9th Cir. 1991)("[L]ike [S]ection 1983, [S]ection
1981 is by nature a tort remedy.  Accordingly, it follows that

causation is also an element of a [S]ection 1981 cause of action."); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987) (applying "traditional tort rules" to causation analysis of Section 1981 claim), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).  A superseding cause, as traditionally understood in common law tort doctrine, will therefore relieve a defendant of liability.  Back, 365 F.3d at 126 (quoting Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997)); Taylor v. Brentwood Union Free Sch. Dist., 143 F.3d 679, 687 (2d Cir. 1998); Jeffries v. Harleston, 52 F.3d 9, 14 (2d Cir. 1995).  Causation is analyzed with respect to each defendant individually.  Coogan v. Smyers, 134 F.3d 479, 485-86 (2d Cir. 1998).

As a preliminary matter, there is disagreement between the parties as to whether Uddin has stated a claim for discrimination under Section 1981.  Defendants argue that he has not, because this law does not prohibit discrimination on the basis of national origin.  Plaintiffs respond that Uddin's claim is based on race, specifically his Asian ancestry, and proceed to misquote the complaint to support their position that "there can be no dispute" that Uddin pled his claim correctly.

The complaint is hardly a model of clarity.  In the first cause of action, plaintiffs allege that "defendants discriminated against plaintiffs on the basis of her [sic] race in violation of Section 1981 by reducing their salary" and further that "[d]efendants knew that their actions constituted unlawful

14

discrimination on the basis of Roberts' [sic] race and/or showed reckless disregard for plaintiff's [sic] rights." The complaint thus alleges discrimination based on only Roberts's race, but is ambiguous as to whether the claimed discrimination violated the rights of Roberts alone or both plaintiffs. In light of conclusion reached below that plaintiffs have failed to produce evidence sufficient to withstand summary judgment, it is unnecessary to resolve this question and it is assumed _arguendo_ that both claims under Section 1981 were properly pled.

A plaintiff makes a _prima facie_ case of discrimination by establishing four elements: (1) plaintiff is a member of the protected class; (2) she is qualified for her position; (3) she has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination. _Abdu-Brisson_, 239 F.3d at 466. Plaintiffs' salaries were cut in the immediate aftermath of a rather hostile election that itself was only one stage in an open power struggle for control of the union. It was an election, moreover, where the salary of an executive officer (and running-mate of the defendants) became a campaign issue that offended members of the Unity slate. And the results of the election, which put plaintiffs at the head of a Board dominated by their deeply antagonized opponents, practically ensured the continuation of factional struggle. In these circumstances, which are all undisputed, and taking all of the evidence in the light most favorable to plaintiffs, plaintiffs have not offered sufficient

evidence to provide a jury with a basis to infer that any of the
defendants, with the exception of Sbar, was motivated by racial
discrimination to cut plaintiffs' salaries.[4]  It is unnecessary
to decide whether this meets the plaintiffs' de minimis burden of
presenting prima facie evidence of discrimination since their
claim fails for the reasons described below.

Defendants offer two non-discriminatory reasons for their
votes to cut plaintiffs' salaries: a desire to save money and
political animus.  Their burden at this point is one of
production, and they have easily carried it.  In addition to the
minutes of the meeting when the vote occurred, defendants point
to their own deposition testimony, also relied upon by
plaintiffs, where several of them explained their reasons for
voting to reduce the salaries.  The defendants' burdens having
been satisfied, any presumptions and burdens drop out of the
analysis and the sole question that remains is whether there is
sufficient evidence to enable a reasonable factfinder to conclude
that plaintiffs were the victims of race-based discrimination.

Plaintiffs argue that these two motives were pretextual and

---

[4] Plaintiffs' evidence concerning Sbar's comments to
Birnahck about Roberts's race is sufficient to make out a prima
facie case against Sbar, but it does not, as they argue,
constitute "direct evidence in defendants' decision to reduce
Roberts'[s] salary."  See Ostrowski v. Atlantic Mut. Ins. Cos.,
968 F.2d 171, 181 (2d Cir. 1992) ("[T]he only 'direct evidence'
that a decision was made 'because of' an impermissible factor
would be an admission by the decisionmaker such as 'I fired him
because he was too old.'  Even a highly-probative statement like
'You're fired, old man' still requires the factfinder to draw the
inference that the plaintiff's age had a causal relationship to
the decision." (citation omitted)).

that the true motive was discriminatory.  Yet even if the
proffered motives were pretextual, as very well may be true with
respect to the desire to cut costs, plaintiffs have not offered
sufficient evidence to permit a factfinder to conclude that the
true motive was discriminatory.  The only probative evidence of
racial animus relates to Sbar.  Plaintiffs point to no evidence
whatsoever, in their briefs or opposition to defendants'
statement of facts, to suggest that Sbar communicated a possibly
discriminatory motive to any of the other Board members or that
he introduced the motion or otherwise encouraged the other Board
members to vote the way he did.[5]  Plaintiffs' evidence with
respect to the other defendants consists entirely of hearsay or
Roberts's feelings; neither is admissible.  See Bickerstaff, 196
F.3d at 456 (noting that "feelings and perceptions of being
discriminated against are not evidence") (citation omitted).  Any
conclusion that the other sixteen defendants harbored a racially
discriminatory motive would be unreasonable on this record.  See
id. at 448 (distinguishing between "evidence that allows for a
reasonable inference of discrimination and evidence that gives
rise to mere speculation and conjecture").

     Meanwhile, there is abundant and uncontradicted evidence to
suggest non-discriminatory reasons for the salary cuts.  Flyers
sent out to delegates before the election drew specific attention
to the salary of the former treasurer and the gross disparity

_____

[5] Indeed, the only evidence in the record suggests that Sbar
said nothing at the meeting where the decision to cut plaintiffs'
salaries was originally made.

between it and the salaries of ordinary union members. And, as plaintiffs point out, there was a widespread feeling among the defendants that plaintiffs' campaign had been anti-Semitic.[6] Whether described as political animus, desire for retaliation, or a feeling that plaintiffs should lie in the beds they made, the evidence is overwhelming that personal displeasure with the plaintiffs was the strongest and most common motivation behind the decision to cut their salaries. There is also evidence to suggest that at least some of the defendants genuinely did feel that the salaries were too high, or that they were out of line with those of other labor leaders or ordinary union members.

It is quite likely that many of the defendants were motivated by several different reasons to vote the way they did. That they did not list all of these reasons in their briefing papers, or attempted to describe them in more genteel, but not entirely accurate terms, is of no moment. With respect to all defendants other than Sbar, "the record conclusively reveal[s] some other, nondiscriminatory reason" for the decision to cut plaintiffs' salaries; those defendants are consequently "entitled to judgment as a matter of law." Reeves, 530 U.S. at 148; see

---

[6] Plaintiffs' attempt to cite the defendants' discussion of "ethnic animus during the election" as evidence of their own racial bias is completely unavailing. Defendants were describing the bias they perceived among the plaintiffs and their supporters. Even if DC 37 did "[take] on a racial divide," there is no evidence to suggest that it resulted from the defendants' prejudices. And to the extent that this development factored into their decision to cut plaintiffs' salary, all of the evidence suggests that it was to punish plaintiffs for their perceived role in fostering the divide.

18

also id. ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent." (quoting Fisher v. Vassar College, 114 F.3d 1332, 1338 (2d Cir. 1997))).

Plaintiffs' claims of racial discrimination suffer a second fatal flaw, this one with respect to all defendants, including Sbar. Specifically, plaintiffs are unable as a matter of law to satisfy the causation element required under Section 1981. Plaintiffs have submitted enough evidence to create a genuine issue of material fact with respect to the motivation of one defendant, Mr. Sbar. Yet "even if some defendants based their decision solely on impermissible grounds, a finding that a majority of defendants acted adversely to the plaintiff on legitimate grounds is sufficient for all to escape liability." Coogan v. Smyers, 134 F.3d 479, 485 (2d Cir. 1998); see also Jeffries v. Harleston, 52 F.3d 9, 14 (2d Cir. 1995) (holding that "votes based on legitimate grounds constitute a superseding cause breaking the causal chain between the tainted motives [of a biased voter] and the decision").[7]

---

[7] This conclusion does not derogate from the principle invoked by plaintiffs that "evidence of discriminatory animus exhibited by an individual who influenced or participated in the decisionmaking process is sufficient to overcome summary judgment." Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1040 n.5 (9th Cir. 2005) (collecting cases). This principle holds, as the Second Circuit recognized "so long as the individual shown to have the impermissible bias played a meaningful role in the [employment decision]." Bickerstaff, 196 F.3d at 450. Whether this condition has been met will certainly depend on the circumstances of the decisionmaking process, and

Plaintiffs' failure to produce evidence sufficient to enable a reasonable factfinder to conclude that a majority of the defendants acted with an impermissible discriminatory motive, or were influenced to act as they did by someone who was impermissibly biased against the plaintiffs, means that not only do their claims fail with respect to those defendants, but also that their claim fails with respect to the one defendant whose motive was genuinely at issue. Summary judgment is appropriate with respect to plaintiffs' claims of race discrimination under Section 1981.

## C. Claims Under New York State and City Antidiscrimination Law

Employment discrimination claims brought under New York State and City laws are analyzed in the same way as a claim under

---

might well depend, at least in part, on whether the defendant is an institution or an independent, individual participant in a collective decision. See Coogan, 134 F.3d at 485-86 (explaining that motives in multi-defendant cases under Section 1983 must be determined individually to satisfy the causation requirement).

Yet however the decision was made, when there is no question of fact as to causation, and the discriminator was not, as a matter of law, a proximate cause of the adverse action, then evidence of that person's animus will not be sufficient to defeat summary judgment. See Bickerstaff, 196 F.3d at 451 (noting that in "the absence of evidence establishing any causal link between [the] alleged discriminatory bias" and an adverse employment action, an allegation that a biased individual "infected the [decisionmaking process] with racism [is] insufficient to raise a question of material fact"). Such must be the case where, as here, a plaintiff offers no evidence that would permit a reasonable factfinder to conclude that Sbar's racial animus had infected the other defendants or the decisionmaking process. Cf. Jeffries, 52 F.3d at 14 (explaining that where a jury finds that a defendant's improper motive did not affect other defendants who based their votes on a legitimate reason, the improperly motivated votes do not cause a cognizable injury).

Title VII.  See Abdu-Brisson, 239 F.3d at 466.  Plaintiffs' race and national origin claims under these laws fail for the reasons described above.  See Bickerstaff, 196 F.3d at 451 (finding no question of material fact in a Title VII claim where there was an "absence of evidence establishing any causal link" between the alleged discriminatory bias and the adverse employment decision).

Roberts's claims of sex-based and age-based discrimination fail for similar reasons.  She has produced evidence of sex-based animus with respect to only two of the defendants, Sbar and Hysyk, and this evidence consisted of nothing more than "stray" remarks completely unrelated to Roberts or her position as Executive Director.  See Abdu-Brisson, 239 F.3d at 468 ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.").  Roberts's other evidence consisted of a "feeling" that a number of men had problems with a woman being in a position of power and a non-defendant's defensive denial of such a problem.  Neither is evidence of the defendants' actual motivations.

The remarks reflecting a possible age-related bias are potentially more probative, as they reflect a view that Roberts might be too old to occupy her position and therefore could tend to prove that an adverse employment action taken by the commenters was motivated by a discriminatory motive.  Plaintiff has not presented any evidence that these comments were actually made by defendants, however.  Indeed, plaintiffs have offered no admissible evidence at all relating to this claim.  Plaintiffs'

brief relies exclusively on hearsay relayed by Roberts in her deposition testimony and the comments described above heard by Uddin, also testified to in deposition. Neither of these is admissible evidence that plaintiffs could use to support their claim to a jury. <u>See</u> Fed. R. Evid. Rule 802 (hearsay not admissible); Fed. R. Evid. 804 (deposition testimony admissible only if declarant unavailable); <u>see also</u> <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997)("The principles governing admissibility of evidence do not change on a motion for summary judgment."). Moreover, in his fleeting references to the issue, Uddin does not even identify who made the comments about Roberts's age. Even assuming admissibility and looking at the proffered evidence in the light most favorable to plaintiffs, and assuming that the comments were made by the defendants present at the meetings, "the evidence [is] so overwhelming that the plaintiff['s salary was cut] for non-discriminatory reasons" that summary judgment is appropriate despite the fact that some defendants "had made several comments generally disparaging" of her age. <u>Renz v. Grey Advertising, Inc.</u>, 135 F.3d 217, 224 (2d Cir. 1997) (discussing <u>Woroski v. Nashua Corp.</u>, 31 F.3d 105 (2d Cir. 1994)).[8]

---

[8] The other evidence relied upon by Roberts to support her age discrimination claim is hearsay and furthermore relates only to the views of Rosenthal, who is not a defendant in this action and was not a voting member of the Board when the salary cut was approved.

## CONCLUSION

Plaintiffs have not offered evidence that would enable a reasonable factfinder to conclude that defendants acted with an impermissible motivation to discriminate when they voted to reduce plaintiffs' salaries. The plaintiffs have raised an issue of fact regarding the motives of only one defendant. Yet even if that defendant had been motivated by improper prejudice, the votes of the rest of the defendants constituted a superseding cause that relieves all defendants of liability. As a result of plaintiffs' failure to raise a genuine issue of material fact with respect to their claims, defendants are entitled to judgment as a matter of law that they did not violate Section 1981 or New York State or City antidiscrimination laws. Defendants' motion for summary judgment is granted; the Clerk of Court shall close the case.

Dated:    New York, New York
             March 27, 2006

_____
DENISE COTE
United States District Judge
